## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| STEPHEN D. WRIGHT, | ) | Civil Action No.: |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **Violation of the ADA/ADAAA (Termination);** |
| vs. | ) | **Violation of the Rehabilitation Act (Termination);** |
| | ) | **Violation of the ADEA (Termination);** |
| HOUSING AUTHORITY OF THE | ) | **Breach of Contract; Breach of Contract** |
| CITY OF CHARLESTON, | ) | **Accompanied by a Fraudulent Act** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | **JURY TRIAL DEMANDED** |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1. That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2. That, upon information and belief, the defendant Housing Authority of the City of Charleston ("defendant" or "Housing Authority" or "HACC") is a quasi-governmental agency doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.

3. That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. § 12101, et seq. (the Americans with Disabilities Act or "ADA" and its 2008 Amendments "ADAAA", collectively referred to as the "ADA/ADAAA"); 29 U.S.C. § 701, 794 (the Rehabilitation Act of 1973); 29 U.S.C. § 623, et seq. (the Age Discrimination in Employment Act or "ADEA"); and 28 U.S.C. § 1331.

4. That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendant does business in the said district, plaintiff resides in

the district, and a substantial portion of the facts giving rise to plaintiff's claims occurred in the said district.

**CONDITIONS PRECEDENT**

5.    That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of his Causes of Action for Violation of the ADEA and ADA/ADAAA, all of which are more fully described below.

6.    That at all relevant times as defined by the ADA/ADAAA and the ADEA, defendant employed fifteen (15) or more employees as required by the ADA/ADAAA and twenty (20) or more employees as required by the ADEA.  As such, the defendant is an "employer" as defined by the ADA/ADAAA and the ADEA and is otherwise subject to and covered by both Acts.

7.    That on or about December 20, 2023, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on age and disability.

8.    That on or about May 7, 2024 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9.    That plaintiff has now timely filed the foregoing action, having done so within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10.    That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.    That plaintiff was born in 1962 and, thus, was over forty (40) years of age during the time of the discrimination alleged herein.

12.    That plaintiff suffers from chronic and long-term spinal and back impairments – impairments that by 2018 had him walking with a pronounced and noticeable limp and which also required plaintiff to walk with a cane as needed.  (Plaintiff carried the cane with him everywhere just in case it was needed, including when he was at work).

13.    That in 2022 plaintiff had surgery which improved, but did not cure, the impairments.  While these impairments significantly limited (and still limit) plaintiff in, among other things, the major life activities of walking, bending, lifting, stooping, pushing, pulling, and sleeping, plaintiff has always been able to perform the essential duties of the jobs he has held with little or no accommodation.

14.    That for approximately 29 years plaintiff enjoyed a long and esteemed career at the City of Charleston Police Department.  Plaintiff started working there as a cadet when he was just 16-years old and over the next 29 years plaintiff rose through the ranks of the department, with several promotions and awards along the way.  By the time plaintiff retired from the force in 2009, he was a lieutenant overseeing the department's Patrol Division for an area that encompassed one-half of the Charleston peninsula – a job that carried a lot of responsibility and skill with it and a job that had plaintiff supervising over fifty (50) police officers.  Plaintiff's performance reviews at the department were all positive or satisfactory and he was never formally disciplined in 29 years of employment there.

3

15. That defendant is an agency whose mission is to provide low-cost rental housing to the disadvantaged population. In carrying out its mission, the defendant purchases and renovates properties and then leases the residences (or units) to those in need at low or affordable prices. Part of this process involves the defendant screening its prospective tenants to try and ensure that they are law-abiding and financially responsible by, for example, running background checks on them. The defendant also collects rent, participates in evictions and responds to issues, incidents and criminal activity occurring at its properties or with its tenants.

16. That in carrying out its mission, defendant has enjoyed a long and beneficial relationship with the City of Charleston Police Department. To this point, for the last 40 years (or since in or around 1983) the police department would assign one (1) to five (5) police officers to help with security at defendant's properties and with its tenants and, in return, defendant would pay the police department a negotiated sum of money to cover the officers' salaries. Beginning in or around 2009, the parties began to memorialize the above arrangement in writing by negotiating and signing two (2) year agreements which were always renewed. One beneficial side effect of this arrangement is that many of the residents connected with or formed a bond with the police officers.

17. That as far as duties are concerned, the officers assigned to the defendant's properties would perform tasks which included, but were not limited to, monitoring defendant's properties, dealing with its residents, and responding to calls regarding incidents or crimes at the properties or involving one of the defendant's residents. And, they would also occasionally perform tasks related to attending eviction appeals. This arrangement between the defendant and the police department actually became a nationally-recognized model for other similar agencies

and police departments around the country and has been implemented in many other jurisdictions.

18.    That during the time plaintiff was employed at the City of Charleston Police Department, he was assigned to work at the defendant's properties under this program on three (3) different occasions during the 1990's:  a four (4) year stint from around 1989 to 1993; a two (2) year stint in the mid-1990's; and a third stint in the late 1990's.

19.    That in undertaking this assignment, plaintiff became intimately familiar with the duties of the job.  He also became very familiar with the workings at defendant and how it operated.  And, plaintiff became very familiar with defendant's properties, its residents, and with its employees there, including upper management.

20.    That in or around September of 2008 (while plaintiff was still employed with the City of Charleston Police Department) defendant's CEO at the time, Donald Cameron ("Cameron") determined that the Housing Authority could benefit by hiring a retired law enforcement officer to serve as a liaison between it, the police department, and other governmental and private agencies.  The position was not an existing one but rather it was newly created by Cameron, presumably with input from his Human Resources Director and the management team.  That same month (September of 2008) defendant posted the new position which was titled as the "Director of Community Security" ("Director of Security").

21.    That around this same time (September of 2008) Cameron approached plaintiff and encouraged plaintiff to apply for the position.   Once plaintiff told Cameron that he was interested in the job, Cameron told plaintiff he could not be hired for the new job unless and until plaintiff first fully retired from the police department.

22.    That having worked as a police officer, having actually been assigned to work at the defendant's properties as a police officer for a significant period of time, and having the immediate ability to retire from the force, plaintiff knew he was a perfect fit for the job.  As such, in or around November of 2008 plaintiff applied for and was hired to be the new Director of Security at defendant.  Of course, in the process plaintiff retired from the City of Charleston Police Department as instructed by defendant.

23.    That on or about February 9, 2009 plaintiff started his new job as the Director of Community Security at HACC.  In taking the job, plaintiff would be earning approximately $30,000 less in salary and benefits than what he had earned at the police department.  Also at the time of hire, defendant assured plaintiff it would pay him retirement benefits, but it never did.

24.    That one of plaintiff's essential duties at his new job involved performing background checks on new employees hired by the defendant, on persons applying to become tenants at the defendant's properties (or prospective tenants), and on any persons involved in any incident or criminal activity on defendant's property or involving one of its tenants.

25.    That whenever any police officer (whether assigned to defendant's properties or not) responded to a call at an HACC property or a call involving one of its tenants, the responding officer would forward a copy of any police report generated from the incident to plaintiff.  Plaintiff would also receive call and report logs from the City of Charleston Police Department regarding the incident.  Next, plaintiff would run background checks on those involved and then prepare a package or file on the incident (which included plaintiff's background checks and any other pertinent information).  At the same time, the Property Manager or Section 8 Coordinator of the property in question would set up a conference with the

resident. On the day of the scheduled resident conference, plaintiff would travel to that meeting with his folder and meet with the resident and the Property Manager or Section 8 Coordinator to discuss the issue and to attempt to resolve it. In the process plaintiff would share the contents of his file with the Property Manager or Section 8 Coordinator.

26.    That plaintiff conservatively estimates he performed close to 300 background checks each month at the defendant. While the actual act of running the background checks is not a complicated duty, the real skill in the process is interpreting the background reports once they were generated – a task plaintiff had performed for many years at the police department and a task plaintiff performed with a high level of expertise.

27.    That also as the Community Security Director at defendant, plaintiff would serve as the liaison between the defendant and community partners, the police department and other agencies. Moreover, plaintiff was charged with monitoring the defendant's alarm system 24/7 on his laptop computer, whether he was at work or at home. In performing this task, plaintiff was required to monitor defendant's properties from 9:00 p.m. until 6:00 a.m. to check and ensure that all doors on the defendant's properties were closed and that all alarm systems were set. If plaintiff discovered that an alarm was not set or that a door was open at any of the properties, plaintiff was required to respond to it regardless of the time of day or night, by either physically going to the property or by resolving it on his computer and/or cellphone.

28.    That to a lesser extent, plaintiff would perform field duties such as checking the defendant's properties or responding to miscellaneous requests – for example, a call reporting that an abandoned vehicle had been left at one of the properties. Finally, by way of example, the duties of plaintiff's job required him to be involved with evicting tenants and participating in eviction appeals. In this regard, in every eviction, the tenant has a right to appeal

to a grievance or hearing officer who is typically a law student at the Charleston School of Law. When this happened, plaintiff would attend, oversee or orchestrate the presentation which typically involved him addressing the hearing officer along with the Property or Section 8 Manager and the respective police department's investigating officer.  That in addition to all of the above, plaintiff would prepare monthly reports for the CEO, which the CEO would incorporate into his reports or presentations to the Housing Authority Board or Commission.

    29. That despite the above (and as made clear in the Agreement between the defendant and the City of Charleston Police Department) plaintiff did not, and could not, supervise the five (5) or so City of Charleston Police officers who worked on defendant's property.  As employees of a para military entity, the police officers remained employed by the City of Charleston Police Department and they continued to report to their supervisors at the police department the entire time the officers performed duties at defendant's premises.  The plaintiff did not have supervisory authority over the police officers so, unlike their real supervisors, plaintiff did not spend time disciplining or admonishing them, providing them with performance evaluations and pay raises, setting their schedules, or training them.  At the same time, the police officers were not even on duty at defendant roughly one-half of the time plaintiff was there working.  And, by way of example, many of the duties plaintiff performed at defendant had nothing to do with the City of Charleston Police officers - for example, plaintiff's job duty to monitor the defendant's properties 24-hours a day to ensure all doors were locked and all alarms had been set, had nothing to do with the officers.  To be sure, defendant hired plaintiff to be a liaison between it and many organizations and entities – not just the City of Charleston Police Department.  Plaintiff had many other job duties which related to being a liaison to these other entities.

30.    That as far as defendant's structure and plaintiff's chain of command, plaintiff was one of seven (7) Directors.  As of 2022, the six (6) other Directors – all on the same level as plaintiff were:  Alex McFarlane (in his fifties), the Director of Housing Management; Diana Hendrix (in her fifties), the Section 8 Director (who in 2022, shortly after plaintiff's layoff, was replaced by Euvelle Carter due to performance issues).  Plaintiff estimates Ms. Carter to be in her late thirties to early forties; Pete Sherman (in his fifties), the RAD Coordinator (who also handles CFO duties); Meghan Kelly (in her fifties), the Director of Human Resources; Tracey Schumacher (in her forties), the Director of Maintenance; and Aris Ferguson (mid-to late thirties), the Authority's General Counsel.

31.    That most of the above Directors had positions reporting to them.  For her part, Kelly only had one (1) part-time employee reporting to her and, while the five (5) or so City of Charleston Police officers performed security-related duties at the defendant's properties and for the defendant's tenants, as the Director of Security, plaintiff did not supervise the said officers in any shape or form.

32.    That as of 2022 plaintiff was the oldest or second oldest Director and he was also the most senior or the second most senior Director in terms of seniority.  And, to plaintiff's knowledge, he was the only Director suffering from a known and visible disability.

33.    That going up the chain of command, all of the Directors reported to the Chief Operating Officer ("COO") of the defendant Authority, Arthur S. Milligan, Jr. ("Milligan").  Milligan, in turn, reported to the CEO at the time, Cameron. In or around December of 2021 Cameron retired, but agreed to stay on with the Housing Authority for another year doing consulting work (though he mostly worked from home during his last year of employment with the defendant).  At the same time, as of January of 2022, Milligan was

promoted into the CEO position at defendant and thereby became the new direct supervisor over all of the Directors, including plaintiff (as his COO position was left unfilled).

34.    That as to plaintiff's job performance at defendant, plaintiff performed his job in an above-satisfactory fashion and otherwise maintained an excellent employment record there.  To this point, plaintiff was experienced and skilled at what he did, as many of his duties at defendant were duties plaintiff had been performing for nearly 30 years at the police department. Moreover, plaintiff always received "meets" or "exceeds" scores on his annual performance reviews, which plaintiff received every September – except for the very last September (September of 2022) that plaintiff was employed with the defendant – an omission plaintiff found to be suspicious.  Plaintiff also always received yearly merit raises at defendant, his supervisors at defendant routinely told him he did a good job, and he was never disciplined while employed with the defendant – despite the fact that defendant has and uses a progressive discipline policy.  Finally, even when defendant fired plaintiff, it told him that his termination had nothing to do with job performance.

35.    That, for the most part, plaintiff's employment at defendant was smooth and without issues.  However, after almost 30 years of police work, plaintiff was experiencing a lot of pain in his lower back.  Over the years, and as plaintiff began to work at defendant, he experienced severe, deep pain in his lower back, legs and back.

36.    That in 2010 or 2011, after plaintiff began employment at defendant, he was diagnosed with arthritis in his spine and with two (2) degenerative, ruptured disks in his back. As a result, plaintiff experienced pain in his back, legs and neck.  These impairments are progressive and, over time, they only became worse.  In general, for most of the time plaintiff was employed at defendant, he treated his pain with light pain medication, which plaintiff took at

night, physical therapy, home exercise, and some epidural injections. While the above treatments did not come close to alleviating the pain, they at least made it so that plaintiff could get up in the morning, go to work, and perform his job duties in a satisfactory or above-satisfactory manner.

37.   That on or about December 28, 2016, while washing his car in a drive-through-style car wash (in the course and scope of his duties at defendant) plaintiff was injured when the driver behind him in the car wash accidentally stepped on her gas pedal and accelerated her car into the back of plaintiff's car. As a result, plaintiff injured his back and neck and exacerbated his existing back injuries. Otherwise, the injury caused plaintiff to file a worker's compensation claim.

38.   That on or about July 3, 2018, during a doctor's visit, plaintiff's physicians advised plaintiff that he had reached maximum medical improvement in regard to his 2016 back and neck injuries. However, they also concluded that plaintiff would still need continued treatment in the form of physical therapy, spinal injections, pain medications and follow-up visits.

39.   That on or about January 25, 2019, plaintiff was again struck from behind by another vehicle as he was at a dead stop on Ladson Road waiting for the traffic light to change. As with the 2016 wreck, this accident injured (and exacerbated) existing injuries plaintiff had to his back and neck.

40.   That shortly after this 2019 accident, plaintiff's physicians noted in their records that plaintiff's back pain became even worse and that the pain was now shooting down plaintiff's legs. Despite continued treatment, plaintiff's pain had not improved. On the contrary, it got worse. As a result, in or around the beginning of February 2019, plaintiff's physicians

directed plaintiff to undergo an MRI.  The results of the MRI revealed, among other things, worsening disk protrusion at L4-L5, eccentric to plaintiff right side and more radicular pain shooting down his right leg.  At that point, plaintiff's physicians concluded (again, in their written reports) that the January 25, 2019 collision had worsened the back and neck injuries plaintiff sustained in the 2016 accident.  But for the time being, plaintiff's doctors did not believe invasive back surgery was warranted.  Thereafter plaintiff's physicians continued to treat plaintiff's impairments with steroid injections, light pain mediation (Tramadol), physical therapy, and home exercise.

41.    That by this time all of plaintiff's impairments began to take a physical toll on him.  Around this general timeframe (at some point between the two (2) accidents), plaintiff began to walk with a noticeable limp, and he began to occasionally walk with a cane when needed (which plaintiff carried with him everywhere he went, but only used when needed).  On several, if not many, occasions, plaintiff took the cane into work and used it there where employees and upper management alike observed him walking with a pronounced limp and using his cane.

42.    That plaintiff's noticeable and pronounced limp, along with his use of a cane sometimes at work, certainly revealed to others at work that plaintiff was an injured and disabled employee.  Yet, as plaintiff's employment record indicates, he continued to perform the essential duties of his job in a satisfactory fashion with little or no accommodation.  To be sure, plaintiff's duties at defendant were far less strenuous than his duties were at the police department.

43.    That throughout this approximate period of time (2018 through 2021) plaintiff's physicians discussed the prospect of invasive lower back surgery with plaintiff.  But in

doing so, plaintiff's physicians advised him the chances for success for this type of surgery was only 50%. Given the low success rate for the operation, and the burden such an operation would have on his body and on his attendance at work, plaintiff opted not to have the surgery. Instead, plaintiff continued to work with the less-invasive medical treatments set forth above.

44.    That as stated, during December of 2021 Cameron had retired as CEO and, beginning in or around January of 2022, Milligan became the interim CEO.

45.    That also in or around 2022, with plaintiff's back, neck and leg pain worsening, his physicians began to discuss a different, less invasive type of procedure with plaintiff – a laminectomy for the implantation of neurostimulator electrodes or, stated in more understandable terms, plaintiff's physicians suggested that he have a nerve pain stimulator implanted under his skin, near or at his lower back and spine.

46.    That with little to no options left, plaintiff agreed to the procedure. As such, in or around June or July of 2022 plaintiff scheduled the surgery for July 27, 2022. Of course, in doing so, plaintiff told his supervisor Milligan and the Human Resource Director Kelly about his impairments and about the surgery. Accordingly, on or around July 27, 2022 plaintiff had the surgery as scheduled. He did so without missing one day of work. On the other hand, plaintiff did request a reasonable accommodation in relation to the surgery in the form of working from home for the first 45 days after the surgery – a request which defendant granted. Otherwise, plaintiff returned to work like he always did – first working from home for the first 45 days after the surgery and then in the office. Surprisingly, the surgery was successful in the sense that it lessened plaintiff's pain to the extent that he did not have to take pain medication every night, but plaintiff still experienced a lot of pain, he still walked with a limp, and he still used a cane to walk when needed.

47.    That after developing his noticeable limp, using a cane at work and then after his July 27, 2022 surgery, plaintiff observed that Milligan and Kelly, who now appeared to be acting together and working more closely with one another, began to treat plaintiff in a dismissive and less-respectful manner in comparison to the way they treated him before the above events.

48.    That in addition to the way Milligan and Kelly began to treat plaintiff, at some point after plaintiff's last surgery Milligan began to make repeated age-related remarks to plaintiff while both Milligan and Kelly started to make repeated disability-related remarks to plaintiff.  For his part, Milligan began to repeatedly ask plaintiff how much longer he planned to work at defendant, the date on which plaintiff planned on retiring from the defendant, whether plaintiff planned on retiring soon, and he would ask plaintiff how much longer he thought he could work or perform his job duties.  At the time, plaintiff had no plans to retire and he communicated this to Milligan. Plaintiff also advised Milligan that, in general, he wanted to work until at least age 65 when plaintiff would be eligible for his full Social Security benefits. Even after answering Milligan's repeated inappropriate questions about  retirement, Milligan still continued to make the same age-related remarks to plaintiff.  Plaintiff estimates Milligan made these comments to him at least five (5) or six (6) times or more during plaintiff's last six (6) to seven (7) months of employment with the defendant.

49.    That the repeated nature of Milligan's questions and remarks to plaintiff (even after plaintiff responded to and/or answered them) and the fact that they really only started after plaintiff's surgery, made plaintiff feel as though Milligan did not want plaintiff to work at the defendant anymore because Milligan wrongfully thought plaintiff's age and disabilities rendered him incapable of performing his job.

50.    That at the same time, Kelly would repeatedly tell plaintiff a story about how someone close to her had the same procedure as plaintiff (the insertion of a nerve pain stimulator in their back), that the procedure did not work for that person, that it only made the pain worse, and that the person never recovered.  Plaintiff estimates Kelly made this type of remark to him approximately four (4) or five (5) times or more during the last six (6) to seven (7) months of plaintiff's employment with the defendant, even making it on the very day plaintiff was terminated.

51.    That by making these remarks to plaintiff, he understood them to mean that his disabilities were on Kelly's mind; that Kelly did not believe that plaintiff's surgery was a success; and that, like the person in her story, plaintiff would only get worse, never recover and that, due to his disabilities, plaintiff was unable to perform the essential duties of his job – a belief that was false.

52.    That knowing full well that plaintiff was plagued by back pain, walked with a limp and used a cane, Milligan would tell plaintiff that, if plaintiff was late to a meeting or to work, plaintiff had to drop on the ground and do 10 pushups – a remark Milligan did not make in jest.  And, in or around October of 2022, when both Milligan and plaintiff were moving into new homes, Milligan needlessly told plaintiff that "Now that we are 'older' it's rough to move."

53.    That plaintiff found all of the above comments, stories and questions inappropriate and discriminatory.  But since they were coming from the defendant's CEO and Director of Human Resources, there was no meaningful avenue he could take to report or complain about their conduct.

54.    That in the midst of the above comments, in or around December of 2022, the current 2-year contract between the police department and the defendant was up for renewal

again.  Plaintiff understood the police department wanted to add several new terms to the agreement, which was not unusual.  What was unusual was that, for the first time in 40 years, a CEO (Milligan) did not want to renew the contract.  In fact, in or around December of 2022, after receiving the proposed contract from the police department, Milligan did not want to sign the agreement or even meet with the police department to negotiate it.

55.    That of course, plaintiff wanted the contract to be negotiated and signed. The officers were a tremendous help to plaintiff, they looked after the safety of the residents, many of whom formed a bond or connection with the officers, they protected defendant's employees and its properties, and plaintiff did not want to break the long and successful tradition.  For these reasons, plaintiff would ask Milligan about the status of the contract. Whenever plaintiff did, Milligan would respond that, "He was thinking about it."  Plaintiff even suggested that Milligan meet with the Mayor and the Chief of Police together or to get Cameron involved if that's what it took to get it negotiated and executed.  But Milligan would only say he was still thinking about it.

56.    That in or around January of 2023 the defendant had still not signed the new contract with the City of Charleston Police Department.  That same month, the police department supervisor over the Police Housing Unit told plaintiff that he had been directed not to assist plaintiff any longer.  When plaintiff advised Milligan about the comment in or around late January of 2023, Milligan again responded he was still thinking about it.  At or near the end of January 2023, the City of Charleston Police Department pulled its officers off of the HACC job and the contract was never negotiated or signed.

57.    That plaintiff was concerned that the amount of work he would have to do without the assistance of any of the police officers would be significantly increased.  Plaintiff

could still perform it, but it would be much harder.  Plaintiff also did not understand why the contract had not been negotiated or signed when the defendant's budget for 2023/2024 had been approved and when it expressly included the plaintiff's salary and the salaries for four (4) City of Charleston police officers.  At the same time, plaintiff could not understand a decision that would have such a negative impact on the safety of the defendant's residents, properties and employees.

58.    That in the meantime, plaintiff understands that Hendrix, the Section 8 Director, was having issues performing her job.  Rather than disciplining, terminating or laying her off, defendant created a new position – an employee training position – and transferred her into it. The defendant then transferred Euvelle Carter ("Carter"), an employee who had been working in a file room with little to do, into the Section 8 Director position.  Also in this regard, plaintiff observed that Mr. McFarlane, the Director of Housing, was not performing his job duties in a satisfactory manner.

59.    That about a month later, on or about Friday, March 3, 2023, Milligan instructed plaintiff to meet him in Kelly's office in the Human Resources Department.  As plaintiff was walking into the building that day, defendant's in-house counsel, Aris Ferguson, was leaving the building and the two exchanged pleasantries with one another.

60.    That once inside Kelly's office, Kelly and Milligan were waiting there for plaintiff.  Kelly, who did most of the talking, first asked plaintiff if he knew why he was there.  Plaintiff candidly responded in the negative.  Plaintiff truly had no earthly idea why he had been called to the meeting.  Kelly then stated that they had decided to eliminate plaintiff's position as HACC was going to go in a different direction.  Kelly then began to go over the Severance Agreement and Release the defendant had prepared for him to sign.  At some point Milligan

stood up to leave the meeting, so plaintiff stood up as well.  While both of the men were standing they shook hands.  In the process plaintiff rhetorically remarked to Milligan, "So the safety of the residents and employees is no longer a priority for the Housing Authority."   In response, Milligan remarked in an apologetic tone that plaintiff was being laid off because of funding (or a lack thereof), vacancies, and because of the RAD program.  He also said that they were going in a different direction by trying to form an alliance with the County – a strategy that plaintiff devised and had already tried but, in the end, the parties were unable to form an alliance then and they still have not formed any such relationship.

61.     That at some point during the meeting (after Milligan had left) Kelly found it appropriate to once again tell plaintiff the story about how someone close to her underwent the same procedure as plaintiff did, that it did not work for that person, that the person was still in a lot of pain, and that the person never recovered – a remark that shows she had plaintiff's disabilities and/or age on her mind when she let plaintiff go and a remark which further shows that Kelly falsely believed plaintiff's disabilities and/or age rendered him incapable of performing his job.

62.     That in the end, Kelly asked plaintiff if he could stay on board for another two (2) weeks – the first week in the office and the second week at home – to help with the transition and to answer questions.   Without signing the Severance Agreement, plaintiff reluctantly agreed to stay for two (2) more weeks.  Despite being told that his layoff was due to funding, plaintiff knew for a fact that his salary and the salaries of the police officers was in the budget for that year and that the budget had already been approved.  Plaintiff knew that because he saw the budget with his own eyes.  In addition to that, plaintiff's job at defendant had nothing to do with vacancies at defendant's properties, funding or the RAD program.

63.     That the following Monday, March 6, 2023, plaintiff returned to work as promised.  On that day Kelly sent a short email to all employees at the defendant advising that, "Due to the restructuring of the police department and community security, Stephen's last day in the office will be Friday, March 10, 2023."  The email further stated that, "Moving forward, please communicate any security concerns with Alex McFarlane."

64.     That otherwise, all Monday, Tuesday and Wednesday of that week plaintiff was barraged with questions from Kelly, other employees and supervisors about how to perform the duties of his job, including questions about background checks.  On Wednesday of that week, when Kelly again came to plaintiff's office to ask him more questions, plaintiff had had enough.  Plaintiff announced to Kelly that he was going home for good and left the premises.

65.     That approximately three (3) weeks after plaintiff's termination he was advised that, during one of Milligan's weekly staff meetings, Kelly proposed hiring a company that could perform background checks for defendant for around $75,000 a year.  At first Milligan was all for the plan, but when the procurement officer interjected that, due to the amount at issue, any such arrangement would have to be approved by the Board, Milligan changed his mind about Kelly's idea.

66.     That on or about May 5, 2023, Kelly sent an email to all of the Board members stating:

> "We wanted to inform you that the position of Director of Community Security was eliminated because the contract between the Housing Authority and the City of Charleston Police Department was ended."
>
> …
>
> "Alex McFarlane, the Director of Housing Management, has been handling security issues that may arise."

67.    That the above is different from what plaintiff was told at his termination meeting where plaintiff was told he was being laid off because of funding, vacancies and the RAD program.

68.    That after plaintiff was terminated, McFarlane, who had been promoted to be defendant's COO, performed the duties of plaintiff's job on an interim basis for approximately six (6) months. Thereafter, defendant posted a job opening for a new position called Security and Public Information Officer – a job which, according to the posting, included many of the exact same job duties that plaintiff performed at defendant.  Ultimately, defendant hired a younger, less-qualified person, with no known disabilities, into the posted position.

69.    That in addition to all of the above, defendant has a Reduction in Force policy on page 110 of its handbook which states in strong and mandatory terms that, "If it is necessary to reduce personnel, the selection of employees to be retained shall be based on their *relative efficiency* and the *necessity of the jobs entailed.*  Other things being equal, *length of service shall be considered*." Based on this criteria, the defendant breached the above policy by selecting the plaintiff to be laid off as his efficiency exceeded the efficiency of other Directors and employees and his job was more necessary than the jobs of other Directors and employees. Moreover, plaintiff would prevail on any close call or tie with another employee because he had more years of service than all the other Directors (or the second most years of service).

70.    That defendant really terminated plaintiff (or selected him for layoff) because of his disabilities (or perceived disabilities) and/or because of plaintiff's age (61), thereby violating both the ADA and the ADEA.

**FOR A FIRST CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**TERMINATION BASED UPON DISABILITY**
**AND/OR PERCEIVED DISABILITY**
**(42 U.S.C. § 12101)**

71.     That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 70 hereinabove as fully as if set forth verbatim.

72.     That as alleged above, at all pertinent times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and otherwise subject to it.

73.     That as a result of plaintiff's chronic and long-term spinal and back impairments, his arthritis in his spine, his two (2) degenerative and ruptured discs in his back, his limp, and the attendant pain, plaintiff was substantially limited in one or more major life activity, namely walking, bending, stooping, lifting, sleeping, standing, and pushing and pulling.   Moreover, the impairments identified above are chronic, long-term and likely lifetime impairments.

74.     That despite the above, plaintiff could perform the essential duties of his job at defendant (with or without reasonable accommodations in the form of intermittent medical leave of a limited nature to attend doctor appointments, the use of a cane, and periodic short breaks from work).

75.     That as such, the plaintiff is disabled as defined by the ADA/ADAAA. Moreover, the defendant regarded or perceived plaintiff as being disabled as defined by that Act, and it erroneously believed plaintiff's disabilities, or perceived disabilities, prevented him from performing the essential duties of his position at defendant.

76.     That as alleged, plaintiff performed his job duties at defendant at a level that met defendant's legitimate expectations as plaintiff always received above-average overall scores on

21

his employment evaluations at defendant; he consistently received annual merit raises; his supervisors routinely complimented plaintiff on his job performance; and plaintiff was never disciplined, placed on a performance improvement plan, or admonished regarding his job performance, his conduct, or attendance during the entire length of his employment at defendant – even though defendant had, and used, a progressive discipline policy and defendant expressly told plaintiff when it terminated him that his termination had nothing to do with performance.

77.     That despite the above, defendant fired plaintiff (or laid him off) without prior warning, notice, discipline or cause (even though the defendant has and utilizes a progressive discipline policy) and for false reasons and/or reasons unworthy of credence.

78.     The moreover, in laying plaintiff off, defendant retained employees (and did not select other employees for the layoff) who were less qualified than plaintiff and were performing their job at a lower level than plaintiff.

79.     That otherwise, defendant's actions in laying off plaintiff (and/or selecting plaintiff for a RIF) were such that they gave rise to the inference of disability discrimination and included, but are not limited to, the following:

(a)     Defendant fired plaintiff without prior notice, warning, discipline or cause;

(b)     The underlying reasons defendant provided to plaintiff for the layoff were false or unworthy of credence;

(c)     The reasons defendant gave to plaintiff for selecting him for layoff were different than the criteria set forth in defendant's own RIF policy which defendant was required to go by and consider in making RIF decisions;

(d)     Defendant deviated from its own RIF policy in selecting plaintiff for the layoff as plaintiff was more efficient at his job and his job was more necessary than the jobs of other directors and employees as set forth above.  Moreover, plaintiff should have been retained had there been a tie between him and another

employee as he had more years of service than all the other directors, or all the other directors except one;

(e)  Plaintiff was the only employee selected for the RIF;

(f)  Plaintiff was the only director with known and visible disabilities;

(g)  Defendant conveniently failed to give plaintiff his last performance evaluation in or around September of 2022 – a document which would have evidenced plaintiff's strong performance at defendant and a document which would have supported retaining plaintiff instead of laying him off;

(h)  That during the last couple of years plaintiff was employed at defendant he began to walk with a noticeable limp and use a cane at work as needed – a circumstance observed by the other employees at defendant, including its CEO, Human Resource Director, and other upper-level management employees.  In or around July of 2022 plaintiff had surgery related to his disabilities – again, a circumstance which defendant's CEO, Human Resource Director and other upper-management employees knew about;

(i)  That after plaintiff began to walk with a limp and use a cane at work, and after his surgery, defendant's CEO and defendant's Human Resource Director began to treat plaintiff in a dismissive and less-respectful manner than they had before those circumstances arose, and they both began to make disability and age-related remarks to plaintiff which could be interpreted to mean they no longer wanted plaintiff to work at defendant because they both erroneously believed plaintiff was too disabled to perform the essential duties of his job at defendant;

(j)  Kelly even made a disability-related remark on the day she terminated plaintiff once again, telling plaintiff that someone she knew who had the same procedure as plaintiff never recovered;

(k)  Defendant gave plaintiff two (2) different and inconsistent reasons for his layoff, with Milligan telling plaintiff he was selected for the RIF because of funding, vacancies, and the RAD Program – factors which were unrelated to plaintiff job and to the layoff criteria stated in defendant's RIF policy, while Kelly told the board that plaintiff was laid off because the defendant failed to renew the contract with the City of Charleston Police Department;

(l)    Even though defendant told plaintiff his job had been eliminated, defendant assigned another employee to perform the duties of plaintiff's job on an interim basis after plaintiff was fired and ultimately defendant hired a permanent employee to perform many, if not most, of plaintiff's job duties under a different title. Neither employee suffered from a known disability; and

(m)    That one of plaintiff's major job duties at defendant was to perform and interpret background checks. Within weeks after plaintiff was laid off, Kelly proposed that defendant contract with an outside firm to do the background checks for $75,000 a year (when plaintiff's salary was around $100,000 a year);

80.    That based upon the above (among other things) defendant violated the ADA/ADAAA by firing and/or laying off plaintiff because of his disabilities and/or perceived disabilities, by laying plaintiff off because of the potential absences associated with his disabilities, and by laying plaintiff off because defendant erroneously believed that plaintiff's disabilities or perceived disabilities rendered him unable to perform the essential duties of his job.

81.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

82.    That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

## FOR A SECOND CAUSE OF ACTION:
## VIOLATION OF THE REHABILITATION ACT OF 1973
## TERMINATION

83.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 82 hereinabove as fully as if set forth verbatim.

84.    That at all pertinent times as defined by the Rehabilitation Act, defendant received substantial and/or significant federal monies, either directly or indirectly, and thereby is subject to the terms of said Act.

85.    That as alleged above in Paragraph 73, plaintiff suffers from impairments which significantly or substantially limit his ability to perform one or more major life activity.

86.    That as alleged above in Paragraph 74, despite plaintiff's impairments, he could perform the essential duties of his job at defendant with or without reasonable accommodations.

87.    That as such, plaintiff is disabled as defined by the Rehabilitation Act. Moreover, defendant regarded or perceived plaintiff as disabled as defined by the Rehabilitation Act.

88.    That at all times plaintiff performed his job duties at defendant in a manner that met defendant's legitimate expectations.

89.    That despite the above, defendant fired plaintiff (or laid plaintiff off) without warning, notice, prior discipline or cause and for false reasons and/or reasons unworthy of credence.

90.    That moreover, in selecting plaintiff for the RIF, defendant retained employees (and, thus, did not select other employees for the layoff) who were less qualified than plaintiff and who were performing their job at a lower level than plaintiff.

91.    That otherwise, defendant's actions as described above and as set forth in Paragraph 79 (a)–(m) give rise to an inference that defendant selected plaintiff to be laid off because of his disabilities and/or perceived disabilities.

92.    That based upon the above, among other things, defendant violated the Rehabilitation Act by firing and/or lay off plaintiff because of his disabilities and/or perceived disabilities, by laying plaintiff off because of the potential absences associated with said disabilities (and/or perceived disabilities), and by laying plaintiff off because defendant erroneously believed that plaintiff's disabilities or perceived disabilities rendered him unable to perform the essential duties of his job.

93.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

94.    That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

<u>**FOR A THIRD CAUSE OF ACTION:**</u>
<u>**VIOLATION OF THE ADEA**</u>
<u>**TERMINATION BASED ON AGE**</u>

95.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 94 hereinabove as fully as if set forth verbatim.

26

96.    That defendant is a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

97.    That defendant is in an industry that affects commerce and defendant employed twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar years and, thus, defendant is an employer as defined by the ADEA, 29 U.S.C. § 630(b).

98.    That plaintiff was born in 1962 and, thus, was well over forty (40) years of age at the time of defendant's discriminatory conduct against him. Therefore, plaintiff was in a protected class and was otherwise covered by the ADEA.

99.    That as alleged, plaintiff performed his job duties at defendant at a level that met defendant's legitimate expectations as plaintiff always received above-average overall scores on his employment evaluations at defendant; he consistently received annual merit raises; his supervisors routinely complimented plaintiff on his job performance; and plaintiff was never disciplined, placed on a performance improvement plan, or admonished regarding his job performance, his conduct, or attendance during the entire length of his employment at defendant – even though defendant had, and used, a progressive discipline policy and defendant expressly told plaintiff when it terminated him that his termination had nothing to do with performance.

100.    That despite the above, defendant fired plaintiff (or laid him off) without prior warning, notice, discipline or cause (even though the defendant has and utilizes a progressive discipline policy) and for false reasons and/or reasons unworthy of credence.

101.    The moreover, in laying plaintiff off, defendant retained employees (and did not select other employees for the layoff) who were less qualified than plaintiff and who were performing their job duties at a lower level than plaintiff. In addition to the above, two (2)

employees performed the duties of plaintiff's job after plaintiff's termination, both of whom were substantially younger and less qualified than plaintiff.

102.   That otherwise, defendant's actions in laying off plaintiff  (and/or selecting plaintiff for a RIF) were such that they gave rise to the inference of age discrimination and included, but are not limited to, the following:

(a)   Defendant fired plaintiff without prior notice, warning, discipline or cause;

(b)   The underlying reasons defendant provided to plaintiff for the layoff were false or unworthy of credence;

(c)   The reasons defendant gave to plaintiff for selecting him for layoff were different than the criteria set forth in defendant's own RIF policy which defendant was required to go by and consider in making RIF decisions;

(d)   Defendant deviated from its own RIF policy in selecting plaintiff for the layoff as plaintiff was more efficient at his job and his job was more necessary than the jobs of other directors and employees as set forth above.  Moreover, plaintiff should have been retained had there been a tie between him and another employee as he had more years of service than all the other directors or all the other directors except one;

(e)   Plaintiff was the only employee selected for the RIF;

(f)   Plaintiff was the oldest, or second oldest, Director at the time he was selected for layoff;

(g)   Defendant conveniently failed to give plaintiff his last performance evaluation in or around September of 2022 – a document which would have evidenced plaintiff's strong performance at defendant and a document which would have supported retaining plaintiff instead of laying him off;

(h)   That during the last couple of years plaintiff was employed at defendant he began to walk with a noticeable limp and use a cane at work as needed – a circumstance observed by the other employees at defendant, including its CEO, Human Resource Director, and other upper-level management employees.  In or around July of 2022 plaintiff had surgery related to his disabilities – again, a circumstance which defendant's CEO,

Human Resource Director and other upper-management employees knew about;

(i)     That after plaintiff began to walk with a limp and use a cane at work, and after his surgery, defendant's CEO and defendant's Human Resource Director began to treat plaintiff in a dismissive and in a less-respectful manner than they had before those circumstances arose, and they both began to make disability and age-related remarks to plaintiff which could be interpreted to mean they no longer wanted plaintiff to work at defendant because they both erroneously believed plaintiff was too disabled to perform the essential duties of his job at defendant;

(j)     Defendant gave plaintiff two (2) different and inconsistent reasons for his layoff, with Milligan telling plaintiff he was selected for the RIF because of funding, vacancies, and the RAD Program – factors which were unrelated to plaintiff job and to the RIF criteria stated in defendant's own RIF policy, while Kelly told the board that plaintiff was laid off because the defendant failed to renew the contract with the City of Charleston Police Department;

(k)     Even though defendant told plaintiff his job had been eliminated, defendant assigned another employee to perform the duties of plaintiff's job on an interim basis after plaintiff was fired and ultimately defendant hired a permanent employee to perform many, if not most, of plaintiff's job duties under a different title.  Both employees were substantially younger than plaintiff; and

(l)     That one of plaintiff's major job duties at defendant was to perform and interpret background checks.  Within weeks after plaintiff was laid off, Kelly proposed that defendant contract with an outside firm to do the background checks for $75,000 a year (when plaintiff's salary was around $100,000 a year);

103.    That based upon the above (among other things) defendant violated the ADEA by firing and/or laying off plaintiff because of his age.

104.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, other economic injury, reasonable attorney's fees and costs and prejudgment interest.

29

105. That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

### FOR A FOURTH CAUSE OF ACTION:
### BREACH OF CONTRACT

106. That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 105 hereinabove as fully as if set forth verbatim.

107. That defendant issued employee handbooks and written policies and procedures to plaintiff which required defendant to follow certain procedures and to use specific criteria when selecting which employees to retain in a reduction of force situation. Specifically, the RIF policy at page 110 of the handbook requires that defendant rely on two (2) factors when deciding which employees would be retained in such circumstances: the employee's relative efficiency and the necessity of the employee's job. In the event there was a tie, the defendant was to rely on the employee's length of service.

108. That the above policies, procedures and assurances applied to plaintiff.

109. That the above policies, procedures and assurances are stated in strong and mandatory terms as evidenced by the use of the word "shall" on more than one occasion in the policy (e.g., "selection of employees to be retained ***shall*** be based on their ***relative efficiency*** and the ***necessity of the jobs entailed.*** Other things being equal, ***length of service shall be considered***.").

110. That in addition to the above, defendant's upper management and Human Resource Department repeatedly told plaintiff that the policies in the handbook were binding on both parties and that defendant and employees alike were required to follow it. As such, the said

handbook or manual gives rise to a contract of employment which served to alter any at-will employment relationship that otherwise may have existed between the parties.

111. That defendant breached the employment contract referred to above by selecting the plaintiff to be laid off when his relative efficiency far exceeded many other directors' or employees' efficiency and when his job was more necessary than the jobs of other directors and employees.  Finally, plaintiff had more length of service than all or all but one director and, if plaintiff was tied with any other director regarding the selection to be retained, plaintiff should have been selected to be retained.

112.  That  as a direct result of defendant's breaches as set forth above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, other economic injury and prejudgment interest.

### FOR A FIFTH CAUSE OF ACTION: BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT

113.  That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 112 hereinabove as fully as if set forth verbatim.

114.  That as alleged above, the parties entered into a contract of employment.

115.  That defendant breached the parties' contract of employment.

116.  That defendant breached the employment contract with fraudulent intent - namely, it wanted to get rid of plaintiff because of plaintiff's age and disabilities.

117.  That defendant engaged in fraudulent actions which accompanied the breach of the contract by, among other things, giving plaintiff false reasons or reasons not worthy of credence for his selection to be laid off.

118.  That as a direct result of defendant's conduct as set forth above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, costs associated with finding other work, psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to professional standing, character and reputation, embarrassment, humiliation, physical and personal injuries and prejudgment interest.

119. That moreover, defendant's actions as alleged above were undertaken intentionally, wantonly, willfully, recklessly, and with utter disregard for plaintiff's protected rights and, therefore, plaintiff is entitled to punitive damages from defendant.

WHEREFORE, plaintiff prays for judgment against the defendant as follows:

(a) As to plaintiff's First Cause of Action under the ADA, Second Cause of Action under the Rehabilitation Act, and Fifth Cause of Action for breach of contract accompanied by a fraudulent act, for such an amount of actual and special damages as the trier of fact may find (including damages for lost back and future wages, income and benefits, economic injury, medical bills and expenses, as well as expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), the costs and disbursements of this action, including his reasonable attorney's fees (except on plaintiff's Fifth Cause of Action), punitive damages, prejudgment interest, and for such other and further relief as the court deems just and proper;

(b) As to plaintiff's Third Cause of Action under the ADEA, plaintiff prays for such an amount of actual and special damages as the trier of fact may find, (including lost back

and future wages, income and benefits, expenses associated with finding other work, medical bills and expenses, other economic injury, plaintiff's reasonable attorney's fees and costs, prejudgment interest, liquidated damages, and such other and further relief as the court deems just and proper; and

(c)  As to plaintiff's Fourth Cause of Action for breach of contract, for such an amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work), other economic loss, prejudgment interest, and such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By:  *A. Christopher Potts*
A. Christopher Potts
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
**Attorneys for the Plaintiff**

Charleston, South Carolina
July 18, 2024